UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11CR106 AGF |
| | ) | (FRB) |
| JOHN K. PERRY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM,**
**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

The defendant was arraigned on the original indictment in this cause on March 30, 2011. At that time he was granted until April 13, 2011, in which to file pretrial motions. On April 12, 2011, the defendant sought, and was granted, until May 13, 2011, in which to file pretrial motions. On May 13, 2011, the defendant filed a Motion To Suppress; Motion To Dismiss; and Motion To Limit Liability. The defendant's Motions were heard on May 27, 2011. Testimony and evidence was adduced on the defendant's Motion To Suppress. On that date the defendant requested, and was granted, leave to file a Supplemental Motion To Suppress raising additional issues. Also at the hearing on May 27, 2011, counsel for the government informed the court and the defendant that it intended to

seek a superseding indictment and that the superseding indictment might address or affect issues raised in the defendant's pending Motion To Dismiss.  The defendant's Supplemental Motion To Suppress was filed on June 10, 2011, and was heard on June 24, 2011.  On July 14, 2011, a superseding indictment was returned.  An arraignment on the superseding indictment was scheduled on August 4, 2011, but was continued several times on request of counsel for the defendant.  Defendant was arraigned on the superseding indictment on August 22, 2011.  At the arraignment counsel for the defendant was asked to inform the court whether the defendant wished to file any new or additional motions as to the superseding indictment.  On August 24, 2011, counsel for the defendant filed a notice with the court stating that he did not wish to file any new or additional motions but that he did wish to proceed with the motions then pending before the court.

1. <u>Defendant's Motion To Suppress (Evidence and Statements)</u>
   (Docket No. 27); and

2. <u>Defendant's Supplemental Motion To Suppress</u>
   (Docket No. 37)

From the testimony and evidence adduced at the hearings on defendant's motion the undersigned makes the following findings of fact and conclusions of law:

<u>Findings Of Fact</u>

On August 11, 2006, United States Postal Inspector Michael J. Levinson applied for a warrant to search the premises

located at 2182 N. Ridge Road, Vermillion, Ohio.  The application
was made to United States Magistrate Judge Patricia A. Hemann in
the United States District Court for the Northern District of Ohio,
Eastern Division.   The application was accompanied by a sworn
affidavit of Inspector Levinson.   The affidavit set out that
Inspector Levinson had conducted an investigation into activities
of Milton E. Morris during which he learned that Morris had engaged
in a scheme to defraud his employer, S.C. Johnson Company, by
conspiring with others to enter into transportation contracts with
various trucking companies at inflated rates.  The companies then
paid kick backs to Morris in cash.   The transactions were
structured and made in such a way as to avoid currency transaction
reporting requirements.   During the investigation Inspector
Levinson interviewed Morris.   Morris identified Tom Buske as the
operator of one of the transportation companies with whom Morris
has conspired to defraud S.C. Johnson Company.  Morris described in
detail the method and manner in which his dealings with Buske were
carried out.

        The affidavit further related that on August 23, 2005,
Inspector Levinson interviewed a confidential witness, identified
in the affidavit as CW1.  CW1 told Inspector Levinson that he was
then an employee of a transportation company owned by Tom Buske.
The company provided transportation services for the Ford Motor
Company plant in Hazelwood, Missouri.   CW1 reported that Buske

conspired with a Ford Motor Company employee named John Perry to defraud Ford Motor Company of substantial sums through a scheme in which false invoices were submitted with inflated prices for services performed by Buske's company. CW1 described in detail the manner and method in which the scheme was carried out. CW1 stated the he had personally participated in the preparation of false invoices. CW1 reported that John Perry had retired from Ford Motor Company and was then living in Colorado in a home purchased for Perry by Buske. CW1 also stated that Perry was hired as a consultant for Buske's company upon Perry's retirement from Ford Motor.

The affidavit further set out that on August 1, 2006, Inspector Levinson interviewed Tammy Perry, the ex-wife of John Perry. The two were divorced in June 2006. Tammy Perry told Inspector Levinson that she was aware of the scheme to defraud Ford Motor carried on between John Perry and Tom Buske. She provided details of the manner and method by which the scheme was carried out. The information coincided with that provided by CW1. Tammy Perry reported that she had personally deposited cash funds obtained by John Perry from Buske as part of the scheme into bank accounts held by her and John Perry. Tammy reported that John Perry had been put on Tom Buske's company payroll as a consultant upon Perry's retirement from Ford Motor and that the scheme continued to operate during such time. Tammy Perry reported that

Buske had purchased vehicles for her and John Perry in 2003, as well as money to build an addition to their home in St. Louis, Missouri. Tammy Perry told Inspector Levinson that John Perry and Buske purchased a home in Colorado, and falsified documents to show that John Perry was the sole owner of the property. Tammy Perry stated that upon their divorce John Perry moved to 2182 N. Ridge Road, Vermillion, Ohio, taking all of his possessions with him. Tammy Perry told Inspector Levinson that John Perry keeps records in a safe in his residence and on a laptop computer. She stated that the laptop is kept in the residence but that Perry takes the computer with him when he travels. Tammy Perry also stated that John Perry and Tom Buske had devised another scheme to defraud Ford Motor Company, at the plant in Louisville, Kentucky. Tammy Perry said the scheme was to be similar to the one carried out by John Perry and Buske at the Hazelwood, Missouri plant. Tammy Perry said they were to be assisted in the scheme by a current Ford Motor Company employee named Ed Martin. Tammy Perry also stated that Buske had formed a new company called SPD-2 to carry out the scheme.

The affidavit also set out that Inspector Levinson had conducted additional investigation which showed that Tom Buske and John Perry had purchased a residence in Colorado with a substantial cash down payment and that a second mortgage on the home was paid off with a substantial payment by John Perry.

Inspector Levinson also confirmed that in January 2005, a company named SPD-2 Logistics, Inc., was incorporated in the State of Kentucky and that the address of record for the company was a post office box number rented by Tom Buske.

Ford Motor Company verified that a person named Ed Martin was then currently employed by the company at its plant in Louisville, Kentucky.

Police officials in Vermillion, Ohio, told Inspector Levinson that John Perry had purchased a residence at 2182 N. Ridge Road, Vermillion, Ohio, in July, 2005.

Lastly, the affidavit set out that based on his training and experience and participation in financial investigations that persons involved in activities such as those described above often maintain records relating to such activities for lengthy periods of time and in their personal residences.  The kinds and types of records are set out in detail.

Based on the information set out in the application and affidavit, Magistrate Judge Hemann found probable cause that certain listed items could be found in the described residence and issued a warrant for the search of the residence for those items. (See Government's Exhibit 1 - Application and Affidavit For Search Warrant; Government's Exhibit 2 - Search Warrant.)[1]

_____

[1]At the hearing on May 27, 2011, the government submitted in evidence unsigned and undated copies of the Application, Affidavit and Search Warrant.  The undersigned requested that the government

On August 16, 2006, agents went to the Ridge Road residence for the purpose of executing the search warrant. They arrived at the residence at approximately 8:00 a.m. There were about a dozen agents present including Inspector Levinson and Agent Juli Ricchio of the Internal Revenue Service, Criminal Investigation Division. The agents knocked on the door to the residence and announced "Police, Search Warrant". John Perry answered the door. The agents advised Perry that they had a warrant to search the residence. Perry's girlfriend, Tamara Tressler, then came to the door. Perry and Tressler were asked to step outside the residence, which they did. The agents conducted a brief, 2-3 minute protective sweep of the residence and found no one else present.

Perry and Tressler then went back into the residence. Perry was accompanied by Agent Ricchio. Inspector Levinson informed Agent Ricchio that Perry had stated that he wished to speak to a lawyer. Tressler was permitted to leave the residence so that she could go to work.

Agent Ricchio and Perry then sat down in a room in the house. Agent Ricchio told Perry that the agents were there to execute a search warrant and that he was free to either leave or

_____

obtain signed, dated and certified copes of the documents, as well as the Inventory and Return filed in the case. Those certified documents were thereafter submitted and are part of the record in this case.

stay as he wished, but that if he chose to leave he could not come back into the house while the search warrant was being executed. Perry said that he wished to stay in the residence. Agent Ricchio then told Perry that she knew that he had said he wanted an attorney and that therefore she was not going to ask him any questions and then said to Perry, "But let me tell you why we're here." Agent Ricchio then told Perry that the agents knew that he was involved in a fraud against Ford Motor Company; that they had a cooperating witness who was also involved in the fraud; and that they knew that Perry had used his position at Ford Motor to approve fraudulent invoices. The defendant then began talking about his position at Ford and the process by which invoices were approved. The defendant continued talking about these matters and answering questions. On several occasions agent Ricchio reminded the defendant that he had earlier said he wanted an attorney and asked whether he wished to continue speaking with the agents. The defendant replied that he didn't need an attorney and continued speaking with Agent Ricchio, and occasionally with other agents. At no time during the execution of the search warrant or during questioning was the defendant ever handcuffed or restrained in any way. No weapons were displayed by the agents during the execution of the warrant or during questioning. The defendant was allowed to use the restroom on several occasions. He was accompanied to and from the bathroom by an agent.

The defendant was not advised of any <u>Miranda</u> rights at any time during any of his contact with the agents on August 16, 2006. At the time of his encounter with the agents on August 16, 2006, Perry was 50 years of age. He had a high school education and two years of college education. He was employed by Ford Motor Company for 30 years and served as Materials Manager at the Hazelwood, Missouri Ford plant from 1999-2004.

The search of the residence lasted approximately four hours. Upon completion of the search the agents left the residence. The defendant remained at the residence when the agents left. Various items were found in and seized from the residence. (<u>See</u> Government's Exhibit 3 - Search Warrant Return and Inventory).

John Perry testified at the motion hearing before the undersigned on May 27, 2011. Perry's testimony agreed in some respects with the testimony of Agent Ricchio and differed in some respects. Specifically and most notably, Perry testified that upon being informed that agents had a warrant to search his residence he told the agents that he wanted a lawyer. He testified that he changed his mind and agreed to speak to the agents only after being told that the agents were investigating fraudulent activity committed by Milton Morris and Tom Buske; that they were concerned that some fraudulent activity might be related to Ford Motor Company; and that he, Perry, was not the "main target" or "focus" of the investigation. Agent Ricchio denied that any such

statements or any other promises, inducements or threats were made to Perry in order to convince him to answer questions.

To the extent that it is necessary to resolve conflicts in the testimony of the witnesses in order to decide the issues raised in the defendant's motion, having had the opportunity to see and hear the witnesses and to consider all matters reflecting on their credibility the undersigned does choose to credit the testimony of Agent Ricchio.

## Discussion

As grounds to suppress the statements made by him to law enforcement agents on August 16, 2006, the defendant asserts in his motion that "The interview of the defendant was a custodial interrogation." Although he does not further elaborate it is assumed that a further basis of this claim is that the defendant's statements should be suppressed because he was not advised of his <u>Miranda</u> rights by the agents before questioning.

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) the Supreme Court held that before questioning a person in custody law enforcement officials must advise the person that he has the right to remain silent; that any statements he makes may be used against him at trial; that he has the right to have an attorney present during questioning; and that if he cannot afford an attorney one will be appointed for him. <u>Id.</u> at 478-79. The officials may question the person after so advising him if the person

voluntarily, knowingly and intelligently waives these rights and agrees to answer questions put to him by the officials.  Absent such advice and waiver, statements obtained through interrogation of a person in custody are not admissible against the person at trial.  Id. at 479.

The proscriptions of Miranda apply only when the person questioned is "in custody." Illinois v. Perkins, 496 U.S. 292, 297 (1990).  A person is in custody within the meaning of Miranda when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" Berkemer v. McCarthy, 468 U.S. 420, 440 (1984); California v. Beheler, 436 U.S. 1121, 1125 (1983).  In determining whether a person was in custody at the time of questioning the court must examine the objective circumstances surrounding the interrogation, Stansbury v. California, 511 U.S. 318, 323 (1994), and to determine from those circumstances "how a reasonable (person) in the suspect's position would have understood his situation." Berkemer v. McCarthy, 468 U.S. at 442.  Miranda does not apply if the person is not in custody, even if the person is suspected of criminal activity or is a focus of the investigation.  Oregon v. Mathiason, 429 U.S. 492, 495 (1977); Beckwith v. United States, 425 U.S. 341, 345 (1976).

In United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990), the Eighth Circuit Court of Appeals identified a number

of factors which the court has looked to in determining whether a person is in custody within the meaning of <u>Miranda</u>. Those factors are as follows: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning. <u>Id.</u>

The defendant was not "in custody" within the meaning of <u>Miranda</u> at any time during the events of August 16, 2006, and when he made statements to law enforcement officials. The defendant was told by Agent Ricchio that he was free to leave if he chose to do so. The defendant elected to remain at the residence during the search. At no time was the defendant ever told that he was under arrest. The defendant was not handcuffed or otherwise restrained at any time. He was permitted to move about the residence and to use the restroom several times, although accompanied by an agent at all times. No weapons were displayed or flourished by agents during the encounter. Although the defendant initially requested

counsel, he later decided to speak with the agents without an attorney present. Although there were numerous agents present in the residence during the search, the defendant's conversation took place primarily with only one agent, Agent Ricchio. Upon conclusion of the search and interview the agents left the residence, and the defendant remained. He was not placed under arrest. Considering all of these circumstances the defendant was not "in custody" at the time of questioning by the agents.

The defendant goes on to say in his motion that "The crucial issues in this case does not involve custodial vs. non-custodial interrogation by government agents . . . . The crucial issue in this case does involve what the agents told the defendant about their investigation and whether his consent to talk was freely and voluntarily given." As noted in the findings above, the defendant claims that he was induced to make statements by the false statements of the agents that he was not the "main focus" or "target" of their investigation, and that the agents were investigating the fraudulent activities of Milton Morris and Tom Buske.

In considering whether statements of a defendant were voluntary, the determinative question is whether the statements were extracted by threats, violence, promises (express or implied), such that the defendant's will was overborne and his capacity for self-determination was critically impaired. <u>Sumpter v. Nix</u>, 863

F.2d 563, 565 (8th Cir. 1988) (citing <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961)). This determination must be made by looking at the totality of the circumstances, including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure. <u>United States v. Meirovitz</u>, 918 F.2d 1376, 1379 (8th Cir. 1990), <u>cert. denied</u>, 502 U.S. 829 (1991). "Obviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." <u>United States v. Astello</u>, 241 F.3d 965, 967 (8th Cir.), <u>cert. denied</u>, 533 U.S. 962 (2001). However, there must be some showing that the officers engaged in some coercive conduct to overbear the will of the defendant. <u>Id.</u> "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'". <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986). "[O]fficers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation caused the defendant's will to be overborne." <u>United States v. Brave Heart</u>, 397 F.3d 1035, 1041 (8th Cir. 2005) (Internal citations and quotes omitted).

The undersigned has found as a matter of fact that the officers did not make the statements attributed to them by the defendant that he was not the "main target" or "focus" of their investigation and that they were investigating the fraudulent activity of Melton Morris and Tom Buske. Rather, the undersigned has found credible the testimony of Agent Ricchio that the defendant was told the agents knew that Perry was involved in a fraud against Ford Motor Company; that they had a cooperating witness who was also involved in the fraud; and that they knew that he had used his position at Ford Motor to approve fraudulent invoices. Therefore, the defendant's claim that his statement was not voluntary because induced by the false statements of the agents is without merit, and serves as no basis to suppress defendant's statements.

Even if the agents made the statements attributed to them by the defendant his statements were nevertheless voluntary. See United States v. Brave Heart, supra. In United States v. Byram, 145 F.3d 405 (1st Cir. 1998) the court found defendant's statement voluntary even though made only after he was told by a police officer that he was not a suspect in the matter under investigation. In that case agents were investigating the murder of an individual named Bither. During the investigation information was developed that Byram was a witness to the murder and in fact had loaded the gun which was used to shoot the victim.

The officer knew that Byram was a convicted felon and that it was unlawful for him to possess a firearm. Byram was contacted by a detective and questioned about the circumstances of the murder. At first he was reluctant to answer questions but did so after the officer told him that he was not "implicated in any of this." During the interview Byram admitted to handling the gun on the night of the murder. Byram was later charged with being a felon in possession of a firearm and his statement to the officer was part of the evidence supporting the charge. The defendant moved to suppress the statement to the officers and the court granted the motion (on grounds other than the voluntariness issue). The prosecution appealed the ruling. On appeal, the court found it necessary to address the issue of the voluntariness of the statement to the officer. <u>Id.</u> at 407. The court noted the standard set out by the Supreme Court in <u>Colorado v. Connelly</u>, <u>supra</u>. The court noted that "Byram's main claim throughout has been that he was tricked by (the officer's) assurance that he was not implicated in Bither's death, literally true so far as the murder charge was concerned but a <u>suggestio</u> <u>falsi</u> as pertains to a possible (firearm) possession charge." <u>Id.</u> at 408. The court then stated that "trickery is not automatically coercion" noting a number of cases in which confessions procured by deceits have been held voluntary. The court then stated that "Given the narrowed definition of coercion in <u>Connelly</u>, it would be very hard to treat

as <u>coercion</u> a false assurance to a suspect that he was not in danger of prosecution . . . . We conclude that under <u>Connelly</u> Byram's interview statement . . . would not be "involuntary" even if he were deceived." <u>Id.</u> For the same reasons the defendant's statements here should not be suppressed on the ground that he was falsely induced to make them. The evidence does not show that the defendant's will to resist questioning by the agents was overborne by any acts of the agents. Therefore, the defendant's claim that his statement was not voluntary because induced by the false statements of the agents is without merit, and serves as no basis to suppress defendant's statements.

As grounds to suppress evidence seized during the execution of the search warrant at the defendant's residence the defendant asserts that the warrant was invalid because the affidavit of Inspector Levinson filed in support of the application for the warrant contained false information. The defendant sought a hearing on the issuing pursuant to the Supreme Court's holding in <u>Franks v. Delaware</u>, 483 U.S. 154 (1978).

Under <u>Franks</u> a defendant may challenge a search warrant on the grounds that the probable cause determination relied on an affidavit containing false statements or omissions made knowingly and intentionally or with reckless disregard for the truth. <u>See</u> <u>Franks</u>, 438 U.S. at 171; <u>United States v. Reinholz</u>, 245 F.3d 765, 774 (8th Cir. 2001). To obtain a <u>Franks</u> hearing a defendant must

make a substantial preliminary showing that there was an intentional or reckless false statement or omission which was necessary to the finding of probable cause, a requirement which is "not easily met." United States v. Gabrio, 295 F.3d 880, 883 (8th Cir. 2002)(citation omitted). Thus, to prevail on a Franks claim the defendant must first demonstrate that the law enforcement official deliberately or recklessly including a false statement in his warrant affidavit. United States v. Carpenter, 422 F.3d 738, 745 (8th Cir. 2005) (citation omitted). The defendant must then show that the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is supplemented. Reinholz, 245 F.3d at 774 (citation omitted). Allegations of negligence or innocent mistake will not suffice to demonstrate reckless or deliberate falsehood. Franks, 438 U.S. at 171; United States v. Davis, 471 F.3d 938, 946 (8th Cir. 2006)(citation omitted). Because "[t]here is . . . a presumption of validity with respect to the affidavit supporting the search warrant[,t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." Franks, 438 U.S. at 171. The substantiality requirement is not lightly met. United States v. Wajda, 810 F.2d 754, 759 (8th Cir. 1987). The test for determining whether an affiant's statements were made with reckless disregard for the truth is whether, after viewing all the evidence,

the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.  <u>United States v. Clapp</u>, 46 F.3d 795, 801 n.6 (8th Cir. 1995).

In support of his motion the defendant submits his own affidavit in which he avers that information set out in the search warrant affidavit at paragraphs 13-15, 18-20, 24, and 28 is not true.  (<u>See</u> Affidavit of John Perry attached as Exhibit A to defendant's Supplemental Motion To Suppress, <u>Franks</u> Hearing (Docket No. 37).  In his affidavit the defendant asserts that information provided to Inspector Levinson by the informant CW1, and information provided to Inspector Levinson by defendant's ex-wife Tammy Perry is not true.  In <u>United States v. Moore</u>, 129 F.3d 989 (8th Cir. 1997), <u>cert</u>. <u>denied</u>, 523 U.S. 1067 (1998) the defendant sought a <u>Franks</u> hearing.  In support of his request he submitted, as does defendant here, his own affidavit claiming that certain information in the affidavit supporting the search warrant application was false.  The court held that "This affidavit, without more, does not provide the 'substantial preliminary showing' that the supporting affidavit contained any deliberate false statements or intentional or reckless misrepresentations required to support a <u>Franks</u> hearing.  When no proof is offered that an affiant deliberately lied or recklessly disregarded the truth, a <u>Franks</u> hearing is not required.  The district court

properly denied the hearing." Id. at 992. See also United States v. McDonald, 723 F.2d 1288, 1294 (7th Cir. 1983), cert. denied, 466 U.S. 977 (1984) (same). The defendant has made no showing that Inspector Levinson intentionally included false information in his affidavit, or included information in the affidavit with reckless disregard as to whether the statements were true. Therefore, the defendant was not entitled to a Franks hearing and his claim serves as no ground upon which to suppress the evidence seized pursuant to the warrant.

As grounds to suppress evidence seized from him the defendant further asserts that some of the information in the affidavit relates to other persons and matters unrelated to him; that neither CW1 or ex-wife Tammy Perry have been shown to be reliable; and that some of the information in the affidavit was stale.

Search warrants to be valid must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband, or a person for whose arrest there is probable cause, may be found in the place to be searched. Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967); Rule 41, Federal Rules of Criminal Procedure. The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions. "In dealing

with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." <u>Brinegar v. United States</u>, 338 U.S. 160, 176 (1949). Probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983). Applications and affidavits should be read with common sense and not in a grudging, hypertechnical fashion. <u>United States v. Ventresca</u>, 380 U.S. 102, 109 (1965). Probable cause may be found in hearsay statements from reliable persons, <u>Gates</u>, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, <u>Draper v. United States</u>, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, <u>McDonald v. United States</u>, 335 U.S. 451, 454 (1948). In considering information provided by an informant police must make a judgment as to the reliability of the information. They may deem the information to be reliable because they have been able to verify details provided by the informant. <u>Id.</u> at 241-45. This is so even though the verified details may be minor and innocent in and of themselves, because an informant who is correct about some details is more likely to be correct about other, unverified details. <u>United States v. Reivich</u>, 793 F.2d 957, 960

(8th Cir. 1986).    Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented.    Gates, 462 U.S. at 230.    Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference if there is a substantial basis for the finding.    Gates, 462 U.S. at 236.

Defendant claims that some of the information set out in the affidavit relates to other persons and matters unrelated to him.  As noted in the findings of fact above, the first section of Inspector Levinson's affidavit set out information concerning a scheme devised by Milton Morris to defraud the company by whom he was employed by approving payments at inflated rates for transportation services.  The affidavit set out Morris' admission to participation in the scheme and his description as to the manner and method by which the scheme was carried out, and that he received kick backs of monies in exchange for his participation in the scheme.  The affidavit also noted that Morris identified Tom Buske as the person with whom he conspired to commit the fraud. Morris also identified the company which Buske had created to carry out the scheme.  The affidavit also set out that financial records reviewed by Inspector Levinson were consistent with Morris' account of the matters.    The affidavit then went on to set out that Inspector Levinson had received information from a confidential witness and John Perry's ex-wife that Buske had participated in a

scheme with John Perry to defraud Perry's employer, Ford Motor Company, in which false inflated invoices were submitted for transportation services by a company operated by Buske to Ford Motor, and that John Perry would approve the invoices. Tammy Perry reported that John Perry received cash payments from Buske in return for his participation in the scheme. The fact that information existed to show that Buske previously engaged in a scheme with another person similar to that as he was reported to have engaged with John Perry, using a similar mode and method of operation as that reported by CW1 and Tammy Perry was properly included in Inspector Levinson's affidavit as it tended to corroborate and lend credence to the information provided by CW1 and Tammy Perry. It was information properly considered in the "totality of circumstances" by the Magistrate Judge in the probable cause finding. Illinois v. Gates, 462 U.S. at 230.

The defendant also claims that neither CW1 nor Tammy Perry were shown to be reliable informants. The reliability of the information provided by CW1 and Tammy Perry is shown within the affidavit. As noted above, their information was corroborated in part by the information relating to the scheme operated by Buske with Milton Morris. The information provided by CW1 and Tammy Perry was consistent with that provided by each other, thus lending further corroboration. See United States v. Oropesa, 316 F.3d 762, 767 (8th Cir. 2003) (Information from informant deemed reliable

because corroborated by similar information from other informants).

The statements of CW1 and Tammy Perry indicate that both were aware of the fraudulent activity and participated in it to one degree or another. The statements were therefore incriminating of them and against their penal interest and therefore lend credence to their credibility. <u>United States v. Tyler</u>, 238 F.3d 1036, 1039 (8th Cir. 2001); <u>United States v. Harris</u>, 403 U.S. 573 (1971). The information provided by CW1 and Tammy Perry was also corroborated by independent investigation by Agent Levinson including banking and corporate records reviewed by Agent Levinson.

The defendant also contends that the information provided by CW1 was stale because provided to Agent Levinson one year prior to the application for and issuance of the search warrant.

> A delay in executing a search warrant may make probable cause fatally stale. But the lapse of time is not always the controlling factor. Other factors must also be considered, including the nature of the criminal activity involved and the kind of property subject to the search. There is no bright-line test for determining when information is stale. Probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit. Time factors must be examined in the context of a specific case and the nature of the crime under investigation.

<u>United States v. Maxim</u>, 55 F.3d 394, 397 (8th Cir. 1995) (Internal citations and quotation omitted). The evidence here showed that

the defendant had participated in an ongoing scheme to defraud. Tammy Perry provided information that John Perry and Tom Buske intended to perpetrate a similar scheme at the Louisville, Kentucky Ford Motor plant through a new company formed by Tom Buske, with the assistance of a current Ford Motor employee. Inspector Levinson verified that a new company associated with Buske was incorporated in the State of Kentucky in January, 2005, and that the named employee was then employed by Ford Motor. Evidence of such ongoing activity supports the findings that evidence of the described criminal activity would be found in the defendant's residence. United States v. McElroy, 587 F.3d 73, 77-78 (8th Cir. 2009). Further, the affidavit recited that Inspector Levinson knew from his 13 years of experience as a postal inspector investigating financial fraud schemes that persons engaged in such activity maintain records relating to such activity for lengthy periods of time. The magistrate judge was entitled to consider that information in the probable cause finding. United States v. Chrobak, 289 F.3d 1043, 1046 (8th Cir. 2002).

For all of the foregoing reasons the defendant's Motion To Suppress and Supplemental Motion To Suppress should be denied.

3.    Defendant's Motion To Dismiss (Docket No. 26)

The defendant moves to dismiss counts 1, 2 and 3 of the indictment alleging that the prosecution of those charges was begun after the six year statue of limitations for such offenses had run.

-25-

The defendant is charged in each of counts 1, 2 and 3 with the offenses of tax evasion, in violation of Section 7201, Title 26, United States Code.  The statute of limitations for such offenses is six years.  26 U.S.C. § 6531(2).

The defendant claims that the six year period began to run on each count on the filing date, or April 15, 2002, as to Count 1; April 15, 2003, as to Count 2, and November 26, 2004, as to Count 3.  The original indictment in this cause was filed on March 24, 2011, beyond six years from the filing date.

However, as noted by the government in its response to the defendant's motion, the offense of tax evasion is a continuing offense, <u>United States v. Marchant</u>, 774 F.2d 888, 891 (8th Cir. 1985), and the statute of limitations does not start to run until the last affirmative act of evasion committed by the defendant. <u>United States v. Ferris</u>, 807 F.2d 269, 271 (1st Cir. 1986).  Thus, if the last act of evasion by the defendant is the filing of a false return, the statute of limitations begins to run on that date.  <u>United States v. Ayers</u>, 673 F.2nd 728, 729-30 (4th Cir. 1982).  However, if the defendant continues to engage in affirmative acts of evasion, the statute does not run until the last such act of evasion.  <u>Ferris</u>, <u>supra</u>.  In its response to the defendant's motion, the government states that it intends to prove at trial that the defendant engaged in affirmative acts of evasion after the filing of his tax returns for the years in question,

including the making of false statements to investigating agents in August 2006, in an effort to conceal unreported income. Those statements are specifically alleged as acts of evasion in each count of the Superseding Indictment filed on July 14, 2011. Such false statements can constitute acts of evasion. <u>Ferris</u>, <u>supra</u>.

The six year statute of limitations is thus inapplicable to the offenses alleged in the indictment and the defendant's Motion To Dismiss should be denied.

4. <u>Defendant's Motion To Limit Liability</u> (Docket No. 28)

In this motion the defendant avers that if he is found liable for any taxes owed that his ex-wife should be required pay a portion of such assessment. This motion appears to raise issues related to penalties to be assessed at sentencing if and when the defendant is found guilty of the charges pending against him. This motion is better left reserved to be ruled by the District Judge presiding if and when any sentence is imposed in this case.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the defendant's Motion To Suppress (Docket No. 27) and Supplemental Motion To Suppress (Docket No. 37) be denied.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion To Dismiss (Docket No. 26) be denied.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion To Limit Liability (Docket No. 28) be reserved to be ruled by the

District Judge presiding if and when appropriate.

The parties are advised that they have until **November 9, 2011,** in which to file written objections to this Report and Recommendation.  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_____
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of October, 2011.